**FILED**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JUN 2 2 2011

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

HUMBERTO LEAL GARCIA, JR., §
TDCJ No. 999162, §
§
            Petitioner, §
§
V. §          CIVIL NO. SA-11-CA-482-OG
§
RICK THALER, Director, §
Texas Department of Criminal §
Justice, Correctional §
Institutions Division, §
§
            Respondent. §

<u>ORDER OF DISMISSAL WITHOUT PREJUDICE</u>

Petitioner Humberto Leal Garcia, Jr. has filed this, his third, federal habeas corpus action challenging his July, 1995 Bexar County conviction for the capital murder of Adria Sauceda and sentence of death. Petitioner has also requested a stay of execution and a stay of proceedings in this cause so he can return to state court and exhaust state habeas remedies on what he admits is a currently-unexhausted claim for relief based upon the decision of the International Court of Justice ("ICJ") in the case of *Avena and Other Mexican Nationals* (henceforth "*Avena*"), and a recently filed piece of proposed federal legislation currently pending before the United States Senate. For the reasons set forth at length hereinafter, petitioner is not entitled to a stay of execution or any other relief from this Court because petitioner's amended federal habeas corpus petition herein is plainly without merit and subject to dismissal under

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts.

## I. Procedural and Factual Background

Pursuant to Rule 201, Fed.R.Evid., this Court takes judicial notice of the contents of the pleadings, motions, state court records, and other documents filed in, or submitted to, this Court in connection with petitioner's previous federal habeas corpus actions,. i.e., cause nos. SA-99-CA-1301-RF and SA-07-CA-214-RF.

## A.  The Offense and Its Aftermath

Late on the evening of May 20, 1994, and continuing well into the next morning, several persons attended an outdoor party held near the home of Juan Francisco "Paco" Delgado at the end of Vincent Street in San Antonio, Texas.[1]  Among the party goers was sixteen-year-old Adria Sauceda.[2]  At one point during the early

_____

[1] At petitioner's trial, Mirasol Torres, then a teenager, testified that she and her friends attended both the party on Vincent Street and another party held several blocks away at another residence, traveling back and forth between the two locations several times during the night. Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 21-23 and 26-28.

At the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner's sister Nancy Leal testified that the party in question was held near the home of Juan Francisco "Paco" Delgado, near the end of Vincent Street. Statement of Facts from Petitioner's State Habeas Corpus Proceeding (henceforth "S.F. State Habeas Proceeding"), Volume II of VII, testimony of Nancy Leal, at p. 64.

[2] Mirasol Torres also testified that she recognized Adria Sauceda, whose nickname Mirasol said was "Freckles," because they

2

morning hours of May 21, an apparently inebriated and only partially clad Adria was observed in the middle of a circle of males who were taking turns getting on top of her.[3]  When two women approached and attempted to lend her assistance, Adria refused their offers and told them to leave her alone.[4]  Adria appeared to be drunk and was unable to assist the women as they attempted to pull her pants back on her.[5]

Around the same time, another party goer, Simon Ortega, became aware that Adria was in a crowd of people in the dark

---

had met before, shared a mutual friend, and had gone to high school together. S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 24-25.

[3] Mirasol Torres testified that she observed Adria with her shirt on but her pants down to her knees in the middle of a circle of guys and it was apparent to her that something was going on because she also observed soiled condoms. S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 28-29.

[4] Mirasol Torres testified further that she and her friend Vicki approached the scene and attempted to help Adria, who appeared "flimsy, like she was real loose, her arms and everything." S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at p. 29.  Torres testified that she and Vicki attempted to pull Adria's pants back up and to get her upright but the intoxicated teenager was unable to assist them and told them to leave her alone. *Id.*, at pp. 29-30.

[5] S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 29-31.  Torres insisted that Adria did not appear to understand what was happening to her and did not appear to be in any condition to consent to what was being done to her. *Id.*, at p. 31.  Torres also testified that the guys who were sexually assaulting Adria told Torres to shut up, go get a drink, and argued that Adria knew what she was doing. *Id.*, at pp. 31-32.

behind the bushes.[6]  Ortega was approached by a male, whom he did
not recognize, who advised Ortega that Adria had passed out, was
back behind the bushes, and had her clothes off.[7]  This same
individual invited Ortega to have sex with her.[8]  Ortega rudely
declined the invitation and, a couple hours later, observed
another male carry Adria out from behind the bushes and place her
on the hood of Ortega's car.[9]  At that time, Adria appeared to
Ortega to be "real shaken up," "disoriented," "not all there,"
and "like if she was in shock."[10]  Ortega unsuccessfully
attempted to communicate with Adria while she was lying on the
hood of his car.[11]

Another male whom Ortega did not recognize then picked up
Adria, carried her to a truck that was parked in the driveway of
the home nearest to the party, and proceeded to "have his way
with her."[12]  Ortega then directed the male who sexually

---

[6] S.F. Trial, Volume XIII of XVIII, testimony of Simon
Ortega, at pp. 150-51.

[7] *Id.*

[8] *Id.*, at p. 151.

[9] *Id.*, at pp. 152 and 155-56.

[10] *Id.*, at pp. 156 and 158.

[11] *Id.*, at pp. 161-62 and 164-65.  Ortega testified that he
feared for the girl's safety because a number of the young males
present appeared and spoke as if there were gang related. *Id.*, at
p. 161.

[12] *Id.*, at pp. 165-66.

assaulted Adria in the truck to place her inside Ortega's vehicle so that he could take her home.[13]  At that point, petitioner approached and directed that Adria be placed inside his vehicle, instead.[14]  When Ortega protested, the petitioner informed Ortega that he knew the girl and her family, knew where she lived, and would take her home and explain everything to her family.[15] Petitioner then drove away with Adria in his blue Mercedes.[16]

Shortly thereafter, petitioner's brother Gualberto and petitioner's sister Nancy arrived at the party.[17]  Gualberto was obviously excited and agitated, shouting, talking fast, and gesturing in an animated manner.[18]  According to Simon Ortega,

---

[13] *Id.*, at p. 166.

[14] *Id.*, at p. 166.

[15] *Id.*, at pp. 167-68.

[16] *Id.*, at p. 168.  Ortega was not the only witness to these latter events.  Juan Martinez, another party goer, observed a male hand Adria to petitioner, whom Martinez saw place her inside his Mercedes and then drive off. S.F. Trial, Volume XIII of XVIII, testimony of Juan Martinez, at pp. 105-07.  Both Ortega and Martinez testified that petitioner drove off in the Mercedes with Adria and no one else. *Id.*, testimony of Juan Martinez, at p. 105; testimony of Simon Ortega, at p. 168.  Ortega also testified that, when she was placed in petitioner's vehicle, Adria was wearing her blouse, shorts, and no shoes. *Id.*, testimony of Simon Ortega, at p. 169.

[17] S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 37-40.

[18] S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 38-40.  Simon Ortega described Gualberto as "shocked, hysterical," "excited," and "yelling." *Id.*, testimony of Simon Ortega, at pp. 171-72; and Volume XIV of XVIII,

petitioner's brother Gualberto jumped out his car and yelled "What the hell happened?"[19] Ortega testified that Gualberto continued yelling, informing those present that petitioner had arrived at his house "full of blood, saying he had killed a girl."[20] According to witnesses, shortly after petitioner's brother and sister departed the scene, two of the males who had remained at the party produced Adria's purse, began scattering the contents of same, and threw it up into a tree, where it became stuck in the branches.[21]

---

testimony of Simon Ortega, at pp. 248-49.

[19] S.F. Trial, Volume XIV of XVIII, testimony of Simon Ortega, at pp. 249-50.

[20] *Id.*, testimony of Simon Ortega, at pp. 250-51. Ortega testified that petitioner's brother arrived at the party and began yelling about 25 minutes after petitioner had left the party with Adria. *Id.*, at p. 251.

[21] S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 43-47. Torres identified the two men who had possession of Adria's purse as Ralph Guerrero and Mickey Sanchez and identified Guerrero as one of the men who had been in the circle around Adria earlier that night. *Id.* Simon Ortega gave a substantially similar account of the disposition of Adria's purse and its contents when he testified. *Id.*, Volume XIII of XVIII, testimony of Simon Ortega, at pp. 173-74.

About the same time, several individuals began searching for Adria's body.[22]  One group of young men finally found Adria lying nude on her back on a dirt road and notified the police.[23]

Photographs introduced into evidence at petitioner's trial documented the grisly scene which greeted police officers.[24]  The

_____

[22] S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at p. 56.  Torres identified the four of the persons who went to look for Adria's body as Juan Martinez, brothers Ray and Mario Aguilera, and a fourth person she could not identify. *Id.*
Juan Martinez testified that he was staying with a friend several blocks from the Vincent Street party when Ray and Mario Aguilera notified him of what petitioner's brother had said and they decided to join a fourth person whom Martinez knew only as "Alex" to search for Adria's body. S.F. Trial, Volume XIII of XVIII, testimony of Juan Martinez, at pp. 109-11.
Simon Ortega testified that, immediately after petitioner's brother and sister left the scene, several persons went looking unsuccessfully for Adria's body in the bushes where she had earlier been seen with several boys. S.F. Trial, Volume XIII or XVIII, testimony of Simon Ortega, at pp. 174-75.  Ortega testified that he knew Adria was not in the bushes because he had seen her drive off with petitioner. *Id.*

[23] S.F. Trial, Volume XIII of XVIII, testimony of Juan Martinez, at pp. 111-13.  Martinez testified that he later led police to the location of the body. *Id.*, at p. 118.

[24] More specifically, State Exhibit Nos. 5, 6, 9, 10, and 11 showed Adria's nude body and battered, bloodied, face. <u>See</u> S.F. Trial, Volume XVIII of XVIII.  San Antonio Police Officer Eddie Williams testified that (1) he was directed to the scene by Juan Martinez and Mario Aguilera, (2) as he approached the clearing next to Leon Creek, he observed a young female, nude, body, lying face up with a huge asphalt rock roughly twice the size of her head lying partially on her left arm, (3) her face was bloodied and there was a gaping hole from one corner of her right eye extending to the center of her head from which blood was oozing, (4) a bloody, fourteen-to-sixteen inch stick was protruding from her vagina, and (5) another four-to-five inch piece of the stick was lying to the left of her skull. S.F. Trial, Volume XIII of XVIII, testimony of Eddie Williams, at pp. 72-78.

autopsy performed on Adria's body revealed (1) she had extremely high levels of alcohol and cocaine in her blood,[25] (2) a stick with a screw in one end had been inserted into her vagina and was protruding from same,[26] (3) Adria suffered extensive bruising and numerous lacerations to her head with accompanying hemorrhage to the soft tissue of the face,[27] (4) the bridge of her nose was

---

[25] Bexar County Chief Medical Examiner Dr. Vincent DiMaio testified at petitioner's trial that (1) he performed the autopsy on Adria Sauceda's body on May 21, 1994, (2) analysis of her blood revealed a blood alcohol level of .255, more than two and a half times the legal limit for driving, (3) further blood analysis reveal a cocaine level of .32 milligrams per liter of blood, significantly above the .1 level at which many people get high from that drug, (4) tests on Adria's blood also showed the presence of three metabolites of cocaine, and (5) while a trace of marijuana was detected in her urine, no significant amount was found in her blood. S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 597 and 602-04. Dr. DiMaio also opined that, based on the foregoing figures, he believed Adria was high on cocaine at the time of her death. *Id.*, at p. 604. Despite the high levels of alcohol and cocaine in her blood, Dr. DiMaio opined that Adria would have been aware of what was happening to her. *Id.*, at p. 626.

[26] Dr. DiMaio testified further that he determined the end of the stick containing the screw had been inserted inside Adria's vagina approximately five and one-eighth inch, causing bruising at the end of her vagina where the screw head impacted, as well as scratching and bruising the inside of the vagina. S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 605-06. Dr. DiMaio also testified that, based upon the nature of Adria's injuries it appeared to him that the stick had been inserted inside her while she was still alive. *Id.*, at pp. 606-07.

[27] Dr. DiMaio testified that Adria suffered (1) hemorrhage of the soft tissue of her face, cheek, and the sides of her face, (2)  swelling and abrasions on her face extending to her forehead, (3) a semi-circular bite mark to her left cheek, (4) abrasions and a laceration to her right eyebrow beginning in the middle of her right eyebrow and running downward and laterally,

fractured and lacerated,[28] (5) the right side of her neck exhibited an oval bruise suggestive of a bite mark,[29] (6) her shoulders, back, and arms displayed numerous bruises and abrasions,[30] (7) an obvious bite mark with visible teeth impressions was present on the left side and back of her chest,[31] (8) the nail on Adria's left middle finger was almost completely torn off while the nail on her right middle finger was completely

---

(5) separate lacerations to her left cheek just below her left eye, to the top of her chin, and to the under-surface of her chin, and (6) swelling and bruising to her lips. S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp.607-10 and 613. Dr. DiMaio testified that the bruise to Adria's left cheek, shown in State Exhibit No. 95, was too poorly defined for him to definitely conclude it was bite but was consistent with a bite mark. Id., at p. 613. While summarizing Adria's external facial and head injuries, Dr. DiMaio made numerous references to State Exhibit Nos. 94-96, which appear in S.F. Trial, Volume XVIII of XVIII.

[28] S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at p. 611.

[29] S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 611-13. Dr. DiMaio testified that the oval bruise and scrapes to the right side of Adria's neck, shown in State's Exhibit No. 96, were suggestive of a bite mark. Id.

[30] S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 613-15. Dr. DiMaio testified that the vertical stripes and rectangular patterns of some of this bruising suggested Adria had been struck by something linear, possibly the stick that had been inserted inside her. Id.

[31] S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 615-16. Dr. DiMaio pointed to State Exhibit No. 97 to illustrate this bite mark. Id.

torn off and missing,[32] (9) Adria suffered massive hemorrhage throughout her scalp and diffuse bleeding in the cranial cavity, as well as bruising of the right front area of the brain, just under the part of the brain that rests on top the eyes, and small hemorrhages of the left side of the brain, resulting from a tremendous amount of force having been applied to her head,[33] (10) Adria had been beaten repeatedly about the face and head with a blunt object, possibly the bloody asphalt rock found near her body, although some of her injuries had definitely been caused by something other than that rock,[34] (11) bruising to the

---

[32] S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 617-18.  Dr. DiMaio used State Exhibit Nos. 98 and 99 to illustrate these injuries and expressed the opinion that both these injuries were defensive in nature. *Id.*

[33] S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 620-23.  Dr. DiMaio opined that (1) a lot of force had been applied to the front of Adria's face, (2) her injuries were inconsistent with her having merely fallen and struck her face or head, (3) Adria had been struck repeatedly, a minimum of three times, in the face and shoulder, and (4) her head had been shaken or struck with sufficient force to cause bruising to the white matter or interior of her brain, not just to the surface of her brain. *Id.*  Dr. DiMaio also opined that Adria's head injuries were consistent with her having received blows to her head while she was laying down and were suggestive of someone having stood over her prone form and delivered blows. *Id.*, at pp. 625-26. However, Dr. DiMaio also opined that some of the blood splatters he observed on Adria's lower chest and abdomen, as well as her thighs and calves, were consistent with her having bled while she was in an upright position. *Id.*, at pp. 623-24.

[34] S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 622, 626, and 628-29.  Dr. DiMaio opined that the blows to Adria's head probably came in fairly rapid succession and that she did not die immediately after the first blow, even though the first blow may have proven fatal. *Id.*, at pp. 630-31.

exterior of Adria's neck was consistent with manual
strangulation,[35] and (12) Adria died from blunt trauma to her
head.[36]

When contacted by the police later on the afternoon of May
21, 1994, petitioner voluntarily accompanied officers to the
police station.[37]   There, petitioner gave police two written
statements.   In his first statement, admitted into evidence at
petitioner's trial as State Exhibit No. 48, petitioner stated
that (1) he drove a girl, whom he said gave him her name as
Evalin Salazar, away from the party toward her home, which she
indicated was on Buda Street; (2) the girl began striking the
steering wheel as he drove; (3) the girl told him to go a
different direction; (4) he restrained her when she attempted to
exit his vehicle while it was moving; (5) he drove her down
Coconino Street and stopped at the end of that street, where she
exited his vehicle; (6) he exited the vehicle and offered to take
her home but she said no and ran into the bushes; and (7) after

_____

While Dr. DiMaio could not say whether Adria lost consciousness
after the first blow struck her, he did acknowledge that one blow
from the rock would have stunned her. *Id.*, at p. 632.

[35] S.F. Trial, Volume XV of XVIII, testimony of Vincent
DiMaio, at pp. 626-27.

[36] S.F. Trial, Volume XV of XVIII, testimony of Vincent
DiMaio, at p. 627.

[37] S.F. Trial, Volume XIV of XVIII, testimony of Vincent
Tristan, at pp. 280-84.

11

he waited ten-to-fifteen minutes for her to return and she did
not, he drove home.[38]

Shortly after petitioner gave police his first handwritten
statement, outlined above, San Antonio Police Homicide Detective
David Evans informed petitioner that petitioner's brother
Gualberto had given police a written statement in which Gualberto
stated that the petitioner had returned home that morning covered
in blood and confessed to having killed a girl.[39]  At that point,
petitioner indicated that he wished to make a second statement to
police.[40]  In his second handwritten statement, which was
admitted into evidence at his trial as State Exhibit No. 49,
petitioner stated that (1) the girl was fighting with him to get
out of his car; (2) after she ran into the woods, he followed her
and attempted to take her back to his car; (3) she hit him and
scratched him in the face so he pushed her and she fell back to
the ground; (4) she did not get up and he was unsuccessful in

---

[38] Petitioner admitted that he gave this first statement to
police when he testified at the punishment phase of his trial.
S.F. Trial, Volume XVII of XVIII, testimony of Humberto Leal,
Jr., at pp. 104-10.  A copy of petitioner's first statement, in
his own handwriting, appears in S.F. Trial, Volume XVIII of
XVIII.

[39] S.F. Trial, Volume XIV of XVIII, testimony of David
Evans, at p. 351.  Detective Evans also testified that Gualberto
Leal gave a written statement to police. *Id.*, at pp. 338-42.

[40] S.F. Trial, Volume XIV of XVIII, testimony of David
Evans, at p. 351.

attempting to wake her; and (5) he saw bubbles coming out her
nose, got scared, and went home.[41]

While conducting a consent search of petitioner's residence
the same day as the discovery of Adria Sauceda's body, two San
Antonio Police Homicide Detectives discovered a beige blouse
lying on the floor under a pile of laundry in the laundry room.[42]
The blouse was later identified as Adria's.[43]   DNA testing of

---

[41] S.F. Trial, Volume XIV of XVIII, testimony of David
Evans, at pp. 352-55.  During his testimony at the punishment
phase of his trial, petitioner admitted that his first written
statement was not completely accurate but insisted that his
second written statement was accurate. S.F. Trial, Volume XVII of
XVIII, testimony of Humberto Leal, Jr., at pp. 110-12.  A copy of
petitioner's second statement, also in his own handwriting,
appears in S.F. Trial, Volume XVIII of XVIII.  During his
testimony at the punishment phase of his capital murder trial,
petitioner insisted that (1) his confrontation with the girl had
occurred on a sidewalk adjacent to a paved street; (2) he left
the unconscious girl fully clothed at a location several blocks
from the spot where her nude body was found; and (3) he did not
bite the girl, did not bash her head in with a rock, and did not
insert the stick into her vagina. S.F. Trial, Volume XVII of
XVIII, testimony of Humberto Leal, Jr., at pp. 112-16.

[42] S.F. Trial, Volume XIV of XVIII, testimony of David
Evans, at pp. 355-61; and testimony of Andy Hernandez, at pp.
411-17.

[43] At petitioner's trial, Simon Ortega identified the blouse
(introduced as State Exhibit No. 1) as the one he had seen Adria
wearing at the party the night before her murder. S.F. Trial,
Volume XIV of XVIII, testimony of Simon Ortega, at pp. 199-201.
Likewise, Adria's father identified State Exhibit No. 14 as a
photograph showing Adria wearing the same beige blouse. S.F.
Trial, Volume XIII of XVIII, testimony of Rene Sauceda, at pp.
130-35.  A Texas Department of Public Safety serologist testified
that the blood stains found on the brown blouse were consistent
with Adria Sauceda's blood type. S.F. Trial, Volume XV of XVIII,
testimony of Donna Stanley, at pp. 536-37.

blood stains on the blouse could not exclude Sauceda as a possible source of the blood thereon but did exclude plaintiff's girlfriend as a possible source of those blood stains.[44]

B.   Petitioner's Indictment

On August 17, 1994, a Bexar County grand jury indicted petitioner in case no. 94-CR-4696 on a charge of capital murder.[45]

C.   Petitioner's Trial

1.   Guilt-Innocence Phase

The guilt-innocence phase of petitioner's trial commenced on July 5, 1995.

a.   The Prosecution's Evidence

The prosecution presented the testimony of Mirasol Torres. Simon Ortega, and Juan Martinez, outlined above, concerning the events that transpired at the party on Vincent Street that

---

[44] S.F. Trial, Volume XVI of XVIII, testimony of Meghan Clement, at pp. 665-66.

[45] Transcript, at pp. 3 and 30.  More specifically, the grand jury charged petitioner in paragraph A of Count I with having intentionally caused the death of Adria Sauceda by striking her with a rock and other objects unknown to the grand jury while in the course of committing and attempting to commit the kidnaping of Adria Sauceda.  In paragraph B of the same Count, the grand jury charged petitioner with having intentionally caused the death of Adria Sauceda by striking her with a rock and other objects unknown to the grand jury while in the course of committing and attempting to commit the aggravated sexual assault of Adria Sauceda.

culminated in the discovery of Adria Sauceda's body.[46]  A trio of

law enforcement officers testified concerning the condition of

Adria's body and the surrounding crime scene at the time of her

discovery.[47]

In addition to hearing expert testimony concerning the

results of the autopsy performed on Adria Sauceda's body,

---

[46] S.F. Trial, Volume XIII of XVIII, testimony of Mirasol
Torres, at pp. 20-68; testimony of Juan Martinez, at pp. 99-126;
testimony of Simon Ortega, at pp. 138-88; and Volume XIV of
XVIII, testimony of Simon Ortega, at pp. 199-201 and 247-56.

[47] More specifically, San Antonio Police Detective McCaskill
testified that (1) he made a videotape recording of the crime
scene, which was admitted into evidence as State Exhibit No. 19
and played up to the nine minute, three second mark before the
jury; (2) he identified an indentation in the ground a short
distance southwest from Adria's body (shown in State Exhibit No.
20) that appeared to match the shape of the large asphalt rock
found lying on her left arm (shown in State Exhibit Nos. 6, 11,
and 21); and (3) the indentation was wet and it appeared someone
had picked up the rock from that point. S.F. Trial, Volume XIV of
XVIII, testimony of Robert McCaskill, at pp. 202-18.
San Antonio Police Officer John Scott Bowers testified that
(1) he took photographs of the crime scene and Adria's body
shortly after the discovery of same; (2) the indentation in the
ground that appeared to match the shape of the large asphalt rock
found lying partially on Adria's left arm (shown in State Exhibit
Nos. 6, 11, and 21) was located approximately 18 feet from the
spot where it was found on Adria's left arm; (3) Adria's missing
finger nail was discovered approximately five feet, six inches
from the head of her body; and (4) a small rock containing blood
splatters (shown in State Exhibit No. 26) was observed next to
Adria's right thigh. S.F. Trial, Volume XIV of XVIII, testimony
of John Scott Bowers, at pp. 256-69.
San Antonio Police Sergeant Jimmy Porter testified that (1)
the large piece of asphalt he collected at the crime scene
weighed between thirty and forty pounds; (2) the soil in the
clearing where Adria's body was found was hard-packed dirt; and
(3) State Exhibit No. 28 was the piece of asphalt he collected
from the crime scene. S.F. Trial, Volume XIV of XVIII, testimony
of Jimmy Porter, at pp. 270-78.

outlined above, the jury also heard testimony from forensic
serologists and DNA experts which established that (1) DNA
testing performed on blood stains found on Adria's brown blouse
were consistent with Adria's DNA type and inconsistent with the
DNA of both petitioner and petitioner's girlfriend[48] and (2) DNA
testing of stains found on petitioner's underwear determined that
the stains contained a mixture of body fluids (i.e., blood,
semen, and vaginal secretions) from different individuals and
that at least some of the genetic material found in those
mixtures could *not* have come from either petitioner or
petitioner's girlfriend Elvira Briones but could have come from
Adria Sauceda.[49]

San Antonio Police evidence technician Warren Titus
testified that his Luminol tests for the presence of blood

---

[48] S.F. Trial, Volume XV of XVIII, testimony of Donna
Stanley, at pp. 535-37; and Volume XVI of XVIII, testimony of
Meghan Clement, at pp. 665-66.  Meghan Clement testified that her
DQ Alpha testing on two of the three blood stains from the brown
blouse could have come from Adria Sauceda but definitely did not
come from either petitioner or petitioner's girlfriend Elvira
Briones. S.F. Trial, Volume XVI of XVIII, testimony of Meghan
Clement, at pp. 665-66.  Ms. Clement was certain the blood stains
on the blouse had not come from either petitioner or petitioner's
girlfriend. *Id.*, Volume XVI of XVIII, testimony of Meghan
Clement, at pp. 667-68.

[49] S.F. Trial, Volume XVI of XVIII, testimony of Meghan
Clement, at pp. 669-82 and 697.  More specifically, Ms. Clement
testified that there were genetic markers in the mixed samples
taken from petitioner's underwear that could have come Adria
Sauceda's blood but which could not come from either petitioner
or Elvira Briones. *Id.*

performed on the Blue Mercedes in which petitioner admitted he
drove Adria Sauceda from the party on Vincent Street were
positive (1) on the exterior of that vehicle and indicated that
the exterior had been wiped in an effort to clean same, (2) on
the interior passenger door panel and indicative of wipe marks in
a downward direction from the door handle, and (3) on the
passenger seat and consistent with a person bleeding while
sitting in that seat.[50]  Based on the foregoing, officer Titus
opined that blood could have been wiped from each of these
surfaces.[51]

A San Antonio Police Detective testified that he took
photographs of petitioner's face and chest on May 21, 1994 after
petitioner was arrested.[52]

A trace evidence analyst testified that both pubic and head
hair samples found on the large asphalt rock found lying on Adria
Sauceda's left arm were microscopically similar to Adria's
hair.[53]

---

[50] S.F. Trial, Volume XIV of XVIII, testimony of Warren K.
Titus, at pp. 287-303.

[51] Id., at p. 303.

[52] S.F. Trial, Volume XIV of XVIII, testimony of Crisoforo
Vieyra, at pp. 388-95.  Officer Vieyra identified State Exhibit
Nos. 58-62 as the photographs of petitioner which he took at the
jail.  Those photographs of petitioner's face, chest, and arm
appear in S.F. Trial, Volume XVIII of XVIII, at pp. 38-40.

[53] S.F. Trial, Volume XV of XVII, testimony of Tim Fallon,
at pp. 583-90.  More specifically, Mr. Fallon testified that (1)

A dental professor expressed opinions that (1) petitioner's teeth matched the bite marks found on Adria's body, (2) only a powerful and prolonged bite would have been sufficient to cause the bite marks on Adria's body, and (3) slippage in one of the marks suggested that either Adria had moved while she was being bitten or the person biting her had made more than one attempt to bite her in the same location.[54]

### b.   The Lone Defense Witness

The defense called only one witness, petitioner's girlfriend Elvira Briones, who testified that she and petitioner engaged in sexual intercourse the night of the party and that she did not notice Adria Sauceda with any men at the party.[55]

---

one pubic hair found on the rock had the same microscopic appearance as Adria's public hair, (2) three head hairs found on the rock were microscopically similar to Adria's head hair, and (3) two other hairs found on the rock were determined to have come from an animal and another human, respectively. *Id.*

[54] S.F. Trial, Volume XVI of XVIII, testimony of Marden E. Alder, at pp. 722 and 724-29.  In addition, Dr. Alder testified that petitioner's teeth were unique in several regard, including an obvious space between the lower right canine and lower right premolar and that the bite mark on Adria's neck was consistent with the arch shape of petitioner's teeth. *Id.*, at pp. 714-15, 719.  Dr. Alder also noted that Adria's skin was broken at the sits of the bite marks on her neck and the side of her chest. *Id.*, at p. 720.  The bite marks he observed on Adria's body were deep and would have required prolonged and intense force to create same. *Id.*, at p. 728.

[55] S.F. Trial, Volume XVI of XVIII, testimony of Elvira Briones, at pp. 764-69.

c.   The Verdict

After deliberating approximately ninety minutes on July 10,

1995, the jury returned its verdict of guilty.[56]

2.   Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial

began and ended the following day, July 11, 1995.

a.   The Prosecution's Evidence

The prosecution presented the testimony of (1) then 16-year-

old Melissa Ruiz, who testified about an incident in May of 1994,

about two weeks before the murder of Adria Sauceda, in which

petitioner sexually assaulted and bit Ruiz on the neck[57]; (2) the

San Antonio Police Officer who investigated Ruiz's report of

---

[56] S.F. Trial, Volume XVI of XVIII, at pp. 835-38; and
Transcript, at pp. 136-50.  The records from petitioner's state
court trial indicate that the jury retired to deliberate at
approximately 3:10 p.m. on July 10, 1995 and sent the trial judge
a note at approximately 4:48 p.m. that same date indicating they
had reached a verdict.

[57] S.F. Trial, Volume XVII of XVIII, testimony of Melissa
Ruiz, at pp. 62-73.  More specifically, Ruiz testified that (1) she
went to a party on Vincent Street where she saw petitioner,
(2) petitioner took her back to his house down the street, where
he undressed her and attempted to have sexual relations with her,
(3) she experienced pain both while petitioner was attempted to
penetrate her and while he was biting her neck but she did not
say anything or scream because she was afraid petitioner would
hurt her if she tried to stop him, (4) after he finished,
petitioner directed Ruiz to go into the bathroom and wash
herself, (5) petitioner took her back to the party and left her
there, (6) she did not go right home but spent that night at a
friend's house before she called her sister and told her what had
happened, and (7) the bite mark remained on her neck for about a
week. *Id.*

petitioner's assault upon her and photographed the bite marks and bruises on Ruiz's body[58]; (3) the physician who examined Ruiz approximately 66 hours after the assault[59]; and (4) Ruiz's older sister Iza Marie, who stated that petitioner had called her repeatedly at her place of employment in the weeks following his assault on Melissa, threatening to have someone kill her if she testified against petitioner.[60]  The prosecution also introduced testimony from law enforcement and school officials establishing that petitioner's reputation for being peaceful and law abiding

---

[58] S.F. Trial, Volume XVII of XVIII, testimony of Angela Rux, at pp. 23-31.  The bite marks on Ruiz's body are shown in State Exhibit Nos. 106 and 107 admitted into evidence at petitioner's trial and included in S.F. Trial, Volume XVIII of XVIII, at p. 110.

[59] S.F. Trial, Volume XVII of XVIII, testimony of Lizette Gomez, at 31-39.  Dr. Gomez observed bruising and redness to Ruiz's vaginal region, two lacerations to Ruiz's hymen, and minimal bleeding during her pelvic examination of Ruiz. *Id.*

[60] S.F. Trial, Volume XVII of XVIII, testimony of Iza Marie Ruiz, at pp. 40-53.  Iza Marie Ruiz testified that she had known petitioner from the time they were both middle school children and she believed petitioner was fully capable of making good on his threats to have her killed if she testified against him. *Id.*, at pp. 46-47 and 51.  Iza Marie also testified that (1) Melissa disappeared for several days, (2) her family did not know where Melissa was, and (3) when she went to pick up Melissa, it was apparent to Iza Marie that her younger sister was crying and scared and had obviously been bitten. *Id.*, at pp. 41-43.  Iza Marie also testified that, during the days after the assault on Melissa, when Melissa was missing and her family greatly concerned about her, Iza Marie spoke with petitioner, who claimed to have no knowledge where Melissa was. *Id.*, at p. 44.

was bad and that petitioner had a history of intimidating and
bullying his fellow students and teachers.[61]

    b.   The Defense's Evidence

The defense offered the testimony of psychiatrist Raymond
Potterf, who testified on direct examination that (1) petitioner
suffered from alcohol dependence and pathological intoxication,
(2) the latter condition occurs when a person who ingests alcohol
experiences a sudden change in mental status and becomes very
aggressive, and (3) there is no cure for petitioner's
condition.[62]  On cross-examination, Dr. Potterf admitted that it
was possible petitioner's tendency toward violence predated
petitioner's problems with alcohol.[63]  On re-direct, petitioner's
trial counsel elicited testimony from Dr. Potterf suggesting that
petitioner had been beaten as a child and that such children tend

---

[61] More specifically, retired teacher Hoyt Garner testified
about an incident in which petitioner had defied and cursed out
Garner and expressed the opinion that petitioner had no respect
for authority and would never change. S.F. Trial, Volume XVII of
XVIII, testimony of Hoyt Garner, at pp. 4-11. San Antonio Police
Officer Wayne D. Harwell, Sr. testified that petitioner's
reputation for being peaceful and law-abiding was bad. *Id.*,
testimony of Wayne D. Harwell, Sr., at pp. 12-17.  Arnold
Trevino, Assistant Principal at South San High School, testified
that petitioner had intimidated both students and teachers when
petitioner was a student at that school. *Id.*, testimony of Arnold
Trevino, at pp. 54-59.

[62] S.F. Trial, Volume XVII of XVIII, testimony of Dr.
Raymond Potterf, at pp. 77-79.

[63] *Id.*, at pp. 80-82.

to develop anti-social personalities.[64]  On re-cross-examination,
Dr. Potterf admitted that persons with anti-social personalities
tend to ignore societal norms and can be dangerous.[65]

The defense also called (1) one of petitioner's former high
school teachers, who testified she had counseled petitioner when
he was her student, petitioner's father had mistreated petitioner
and one of petitioner's brothers, and she had never felt afraid
of petitioner[66]; (2) a 14-year-old friend of petitioner, who
testified about an incident in which petitioner had saved his
life by shoving him out of the way of gunfire[67]; (3) petitioner's
14-year-old brother Carlos, who testified that Melissa Ruiz had
sent petitioner love letters a few years before petitioner's
assault on her[68]; and (4) petitioner's mother, who testified
petitioner began drinking until he passed out about a year and a
half ago and requested the jury to be merciful and have pity on
petitioner.[69]

---

[64] *Id.*, at pp. 82-83.

[65] *Id.*, at pp. 83-84.

[66] S.F. Trial, Volume XVII of XVIII, testimony of Mary
Matamaros, at pp. 85-89.

[67] S.F. Trial, Volume XVII of XVIII, testimony of Edward
Anthony Carter, at pp. 122-25.

[68] S.F. Trial, Volume XVII of XVIII, testimony of Carlos
Leal, at pp. 128-30.

[69] S.F. Trial, Volume XVII of XVIII, testimony of Maria
Francesca Leal, at pp. 131-35.

Petitioner testified that (1) although he did not get along with his father, his father had never beaten or hurt him[70]; (2) he was sorry the girl had died but felt her family, rather than the jury, should decide his fate[71]; (3) he had been a good inmate while awaiting trial, he had no criminal record other than this one offense, and he was not a violent person[72]; (4) he was very drunk on the date in question and, while what he did was wrong, he had not done what he was accused of having done[73]; (5) he would probably keep the peace if sent to prison but would act to defend himself if he felt threatened[74]; and (6) he had no gang affiliation.[75]  On cross-examination, petitioner (1) insisted that he was innocent despite the jury's verdict of guilty[76]; (2) admitted that Adria scratched him, he pushed Adria, he felt something wet on the back of her head, he shook Adria in an unsuccessful attempt to wake her, and he fled in fear when he saw

---

[70] S.F. Trial, Volume XVII of XVIII, testimony of Humberto Leal, Jr., at p. 91.

[71] *Id.*, at pp. 92-94.

[72] *Id.*, at p. 94.

[73] *Id.*, at p. 95.

[74] *Id.*, at p. 95.

[75] *Id.*, at p. 96.

[76] *Id.*, at pp. 96-97 and 103.  Petitioner even stated that he hoped to obtain a reversal of his conviction on appeal. *Id.*, at pp. 96-97.

bubbles coming out of her nose[77]; (3) denied he (a) wiped blood from the Mercedes, (b) did anything more to Adria than push her down, (c) took her clothes off, (d) beat her with a rock, (e) bit her, or (f) shoved a stick inside her[78]; (4) suggested that his father found Adria's blouse in the street and brought it inside the house[79]; (5) stated that, as he was taking Adria from the party, he turned at the end of Vincent Street in the opposite direction from the way Adria directed him to go and, when Adria attempted to get out of his car, he initially refused to allow her to do so and refused to stop so she could do so[80]; (6) stated that Adria got out his vehicle and, when he attempted to take her back to his car, she began hitting, pushing, and scratching his face[81]; (7) stated that he left Adria's body fully clothed, along the side of a street, three or four streets over from the location where he nude body was found[82]; (8) denied that he bit

---

[77] *Id.*, at pp. 101-03.

[78] *Id.*, at pp. 98, 103, 112, and 115-16.  Petitioner suggested that his father used the Mercedes to go hunting and that might explain why traces of blood were found inside the vehicle. *Id.*, at p. 100.

[79] *Id.*, at p. 101.

[80] *Id.*, at pp. 105-08.

[81] *Id.*, at pp. 108-12.

[82] *Id.*, at p. 112-14.

her neck or chest[83]; and (9) admitted that any person who could bash in Adria's head, leave her with a stick inside her, and take a piece of her clothing as a trophy was a violent and dangerous person.[84]  On re-direct and re-cross-examination, petitioner denied that he raped or bit Melissa Ruiz.[85]

      c.   <u>The Verdict</u>

After deliberating less than two hours on July 11, 1995, the jury returned its verdict at the punishment phase of petitioner's capital murder trial, finding that (1) there was a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) there was insufficient mitigating evidence to justify a life sentence rather than a sentence of death.[86]

---

[83] *Id.*, at p. 115.  At one point during his cross-examination, petitioner laughed at the prosecutor and accused her of calling him a dog, to which the prosecutor replied "You got that right." *Id.*, at p. 114.

[84] *Id.*, at pp. 116-17.  More specifically, petitioner testified that he believed whomever had done these things to Adria's body deserved to die. *Id.*, at p. 116.

[85] *Id.*, at pp. 117-20.

[86] S.F. Trial, Volume XVII of XVIII, at pp. 166-73; and Transcript, at pp. 159-60 and 162-63.  The records from petitioner's capital murder trial indicate that the jury retired to deliberate at the punishment phase of trial at approximately 2:33 p.m. on July 11, 1995 and sent the trial judge a note indicating it had reached a verdict at approximately 4:23 p.m. that same date. Transcript, at pp. 159-63.

D.   Direct Appeal

Petitioner appealed his conviction and sentence.  In his 130-page appellant's brief, petitioner asserted 43 points of error.  In points one through six and twenty-eight through thirty-one, petitioner raised claims of legally and factually insufficient evidence to support the jury's verdicts at both phases of his capital murder trial.  In his seventh and eighth points, petitioner attacked the trial court's admission of Gualberto Leal's previous statements at the urging of the prosecution to impeach that prosecution witness.  In his ninth and tenth points, petitioner attacked the admission of allegedly hearsay testimony by Simon Ortega and Mirasol Torres.  In his eleventh through twenty-second points, petitioner challenged the admission of various photographs of the crime scene, the victim, and petitioner's injuries.  In his twenty-third through twenty-seventh points, petitioner complained about the admission of purported victim impact evidence in the form of photographs of the victim and testimony about her background.  Petitioner's thirty-second through thirty-fifth points challenged the punishment phase jury instructions, specifically arguing that the term "mitigating evidence" was too narrowly defined and that the jury was not informed of the effect of a hung jury.  Petitioner's thirty sixth through thirty-eighth and fortieth points challenged the trial court's denial of his motions to set aside the verdict

and for new trial.  Petitioner's thirty-ninth point challenged the admission of the testimony of Melissa Ruiz regarding petitioner's unadjudicated extraneous criminal acts. Petitioner's forty-first point challenged the death penalty as a violation of the Eighth Amendment.  In his final two points, petitioner argued the Texas capital sentencing scheme affords no meaningful appellate review to the jury's verdict as to the second capital sentencing special issue, i.e., the mitigation special issue, and fails to properly assign the burden of proof regarding mitigating evidence in that same special issue.

In an unpublished opinion, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Leal v. State*, No. 72,210 (Tex. Crim. App. February 4, 1998).  The United States Supreme Court denied petitioner's petition for writ of certiorari on February 22, 1999. *Leal v. Texas*, 525 U.S. 1148, 119 S.Ct. 1046, 143 L.Ed.2d 53 (1999).

E.    Petitioner Notifies the Mexican Consulate

On or about March 7, 1997, petitioner notified Mexican consular officials of his conviction.[87]

---

[87] *Affidavit of Manuel Uribe, at ¶24, attached as Exhibit 17 to Petitioner's Amended Petition for Writ of Habeas Corpus,* filed June 17, 2011, docket entry no. 8 (henceforth "Amended Petition").

F.    First State Habeas Corpus Proceeding

On September 17, 1997, petitioner filed his first application for state habeas corpus relief.[88]  On October 19-21 and November 23, 1998, the state trial court held an evidentiary hearing in petitioner's initial state habeas corpus proceeding.

On April 23, 1999, the state trial court issued an Order containing its findings of fact, conclusions of law, and recommendation that petitioner's first state habeas corpus application be denied.  Among its findings of fact, the state habeas trial court determined (1) petitioner gave his trial counsel several different versions of how petitioner killed Adria Sauceda, one of which corresponded to petitioner's second written statement to the police; (2) petitioner never specifically admitted that he had intentionally killed Adria Sauceda but did admit to his trial counsel that he was alone with Adria when she died; (3) based on the information related by petitioner, his trial counsel believed there was a plausible explanation for the presence of Adria's blood on petitioner's underwear; (4)

---

[88] As grounds for state habeas corpus relief, petitioner's first state habeas application asserted (1) more than twenty instances of ineffective assistance by his trial counsel; (2) constructive denial of counsel; (3) alleged violations of the Vienna Convention arising from the admission of petitioner's two written statements; (4) the trial court erred in directing the jury to disregard the impact of parole laws on petitioner's sentence; (5) the Texas capital sentencing special issues were unconstitutionally vague; and (6) numerous claims that mirrored many of his points of error on direct appeal.

petitioner's trial counsel consulted with a dentist whose opinion regarding the bite mark evidence corresponded with that of the prosecution's expert; (5) petitioner's trial counsel did not consult with Dr. Potterf before putting him on the stand but did review Dr. Potterf's written report and called him to testify for the purpose of showing that, due to petitioner's intoxication, petitioner lacked the specific intent to kill; (6) petitioner's trial counsel was aware of the double-edged nature of Dr. Potterf's testimony regarding petitioner's anti-social personality; (7) the opinions expressed by petitioner's DNA expert during petitioner's state habeas corpus hearing were not inconsistent with the opinions expressed by the prosecution's DNA experts at trial; (8) at petitioner's state habeas corpus hearing, Dr. Alder again testified that, within a reasonable medical certainty, petitioner's teeth caused the bite mark on Adria's chest; (9) petitioner presented no evidence showing how a forensic pathologist appointed to assist the defense would have helped petitioner at trial; (10) none of petitioner's family ever told petitioner's lead trial counsel about seeing others at the party with blood on their clothing or about a videotape recording of the crime scene; and (11) petitioner was not in custody at the time he gave police his two written statements.

In its conclusions of law, the state habeas trial court concluded (1) the decisions by petitioner's trial counsel to call

Dr. Potterf to testify and not to challenge prosecution evidence regarding blood stains on the interior of the Leal vehicle, bite marks, and DNA and blood test results were legitimate trial strategies and did not prejudice petitioner; (2) petitioner was not prejudiced by any alleged errors committed by his trial counsel during jury selection; (3) petitioner's complaints about his trial counsel's failure to call petitioner's family members to testify at trial did not satisfy the prejudice prong of *Strickland v. Washington*; (4) there was no evidence that petitioner's conduct in causing Adria Sauceda's death was merely reckless; (5) petitioner's statements were not admitted in violation of the Vienna Convention; (6) petitioner procedurally defaulted regarding his complaints about the trial court's jury instructions regarding parole eligibility and the effect of a hung jury; and (7) several of petitioner's remaining complaints were disposed of in the course of his direct appeal and not properly the subject of a state habeas corpus proceeding.

The Texas Court of Criminal Appeals denied petitioner's first state habeas corpus application in an unpublished written Order based on the state habeas trial court's findings and conclusions. *Ex parte Humberto Leal, Jr.*, App. No. 41,743-01 (Tex. Crim. App. October 20, 1999).

G.   <u>First Federal Habeas Corpus Action</u>

On March 13, 2000, petitioner filed his first federal habeas corpus action in this Court, asserting a wide array of claims, which was docketed as cause no. SA-99-CA-1301-RF.  District Judge Royal Furgeson, who presided over the petitioner's first federal habeas corpus proceeding, i.e., cause no. SA-99-CA-1301-RF, described petitioner's claims as follows:

> As grounds for relief, petitioner argues that (1) his trial counsel rendered ineffective assistance by (a) failing to request the assistance of a DNA expert and adequately challenge the prosecution's DNA evidence; (b) failing to adequately cross-examine the prosecution's witness regarding blood stains found inside the vehicle petitioner was observed driving the night of the murder; (c) failing to request the assistance of a forensic odontologist and adequately challenge the prosecution's evidence regarding human bite marks found on the victim's body; (d) failing to request the assistance of a mental health expert and by presenting evidence at the punishment phase of trial indicating the petitioner likely possessed a sociopathic personality; (e) wasting three peremptory challenges during jury selection, failing to rehabilitate potentially favorable members of the jury venire, making ineffectual challenges for cause, failing to object to misstatements of the law made by the prosecution during voir dire, failing to make a *Batson* objection, and failing to exhaust petitioner's peremptory challenges and request additional strikes, thereby preserving alleged error for appellate review; (f) failing to present exculpatory testimony from petitioner's family members; (g) failing to investigate, develop, and present exculpatory physical evidence  regarding evidence found on or near the victim's body that did not match the petitioner; (h) failing to investigate allegations of unadjudicated extraneous criminal conduct made by a prosecution witness at the punishment phase of trial; (i) failing to object to improper prosecutorial argument; (j) failing to request a jury instruction on the lesser-

included offense of  reckless homicide, i.e.,
involuntary manslaughter; and (k) under the totality of
the circumstances, petitioner's trial counsel's
performance was ineffective; (2) petitioner's trial
counsel's performance was not merely deficient and
prejudicial to petitioner but was so lacking in
reasonableness as to constitute a constructive denial
of counsel warranting a presumption of prejudice; (3)
the "aggravating" factors in the second Texas capital
sentencing special issue are unconstitutionally vague
and do not adequately guide the jury's discretion at
the punishment phase of trial; and (4) the state trial
court erred in admitting evidence at the punishment
phase of trial of unadjudicated offenses allegedly
committed by petitioner.

*Leal v. Dretke*, 2004 WL 2603736, *1 (W.D. Tex. October 20, 2004),
*CoA denied*, 428 F.3d 543 (5th Cir. 2005), *cert. denied*, 547 U.S.
1073 (2006).

Writing for this Court, Judge Royal Furgeson denied all of

petitioner's claims for relief therein on the merits and denied

petitioner a CoA. *Leal v. Dretke*, 2004 WL 2603736, *34.

The Fifth Circuit likewise concluded none of petitioner's

claims therein deserved a CoA. *Leal v. Dretke*, 428 F.3d 543, 553

(5th Cir. 2005), *cert. denied*, 547 U.S. 1073 (2006).

H.    Second State Habeas Corpus Proceeding

Petitioner filed his second state habeas corpus application,

arguing therein he was entitled to relief from his capital murder

conviction and sentence of death by virtue of the determination

on March 31, 2004 by the International Court of Justice at the

Hague (henceforth "ICJ") in the case of *Avena and Other Mexican

Nationals (Mexico v. United States of America)* (henceforth

"*Avena*") that the United States of America had failed to fulfill

its treaty obligations under Article 36 of the Vienna Convention

with regard to petitioner and numerous other Mexican citizens then on death row in various jurisdictions throughout the United States. *See Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.A.)*, No. 128, 2004 I.C.J. 12, 2004 WL 2450913 (March 31, 2004)(henceforth "*Avena*").   Relying upon its earlier decision in *Ex parte Medellin*, 223 S.W.3d 315 (Tex. Crim. App. 2006), the Texas Court of Criminal Appeals summarily dismissed petitioner's second state habeas corpus petition pursuant to the Texas writ-abuse statute. *Ex parte Humberto Leal*, App. No. WR-41,743-02, 2007 WL 678628 (Tex. Crim. App. March 7, 2007).   The United States Supreme Court denied petitioner's request for certiorari review on March 31, 2008. *Leal Garcia v. Texas*, 552 U.S. 1295, 128 S.Ct. 1736, 170 L.Ed.2d 538 (2008).

I.   Second Federal Habeas Corpus Action

On March 14, 2007, under the name Humberto Leal Garcia, petitioner filed in the Austin Division of this Court his second action pursuant to Section 2254 of Title 28, United States Code, challenging his July, 1995 Bexar County capital murder conviction and sentence of death.   Following discovery by the Clerk's office that petitioner had filed and fully litigated a prior federal habeas corpus action challenging the same state criminal conviction in cause no. SA-99-CA-1301-RF, on March 19, 2007, petitioner's Austin habeas corpus action was administratively

transferred to the San Antonio Division of this Court and docketed as no. SA-07-CA-214-RF.

After several months of review, writing once again for this Court, District Judge Royal Furgeson (1) dismissed without prejudice petitioner's federal habeas corpus petition herein as a successive petition (instructing petitioner to seek permission for the filing of same from the Fifth Circuit in conformity with 28 U.S.C. §2244(b)(3)) but (2) alternatively, reached the merits of petitioner's Vienna Convention claim and determined the acknowledged violation of petitioner's right under the Vienna Convention to consular notification following petitioner's arrest had not caused petitioner "actual prejudice" within the meaning of the March 31, 2004 decision by the International Court of Justice at the Hague (henceforth "ICJ") in the case of *Avena and Other Mexican Nationals* (henceforth "*Avena*"), and (3) granted a CoA with regard to both the procedural issue of whether petitioner's petition was "successive" within the meaning of Section 2244 and the substantive issue of whether petitioner had sustained "actual prejudice" within the meaning of the ICJ's *Avena* decision. *Leal v. Quarterman*, 2007 WL 4521519, *8-*25 (W.D. Tex. December 17, 2007).

Petitioner appealed.  In an opinion originally issued June 15, 2009 [*Leal Garcia v. Quarterman*, 2009 WL 1658029 (5th Cir. June 15, 2009)], and then re-issued on June 24, 2009, the Fifth

Circuit (1) concluded Judge Furgeson had erroneously determined petitioner's federal habeas corpus petition therein was a "successive" petition within the meaning of Section 2244 and erroneously dismissed same without prejudice, (2) vacated Judge Furgeson's findings of fact and conclusions of law denying petitioner's Vienna Convention/*Avena* claim on the merits (i.e., this Court's conclusion that petitioner's claims did not warrant federal habeas corpus relief), and (3) modified the judgment of dismissal therein to make same *with* prejudice, based upon the Supreme Court's intervening opinion in *Medellin v. Texas*, 552 U.S. 491, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008).[89] *Leal Garcia v. Quarterman*, 573 F.3d 214, 224-25 (5th Cir. 2009). Petitioner did not thereafter seek review of the Fifth Circuit's ruling on the merits from the United States Supreme Court via petition for writ of certiorari.

However on June 16, 2011, petitioner filed a motion pursuant to Rule 60(b), Fed.R.Civ.P., seeking to re-open his federal habeas corpus action therein, along with separate motions seeking

---

[89] In *Medellin v. Texas*, the Supreme Court concluded the ICJ's *Avena* judgment was not automatically binding domestic law but declined to determine whether Article 36 of the Vienna Convention itself granted foreign citizens individually enforceable rights. *Medellin v. Texas*, 552 U.S. 491, 506 & n.4, 128 S.Ct. 1346, 1357 & n.4, 170 L.Ed.2d 190 (2008). Instead, in *Medellin*, the Supreme Court assumed without deciding, as it had in *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 342-43, 126 S.Ct. 2669, 2677-78, 165 L.Ed.2d 557 (2006), that Article 36 did grant foreign citizens such individual rights. *Medellin v. Texas*, 552 U.S. at 506 n.4, 128 S.Ct. at 1357 n.4.

a stay of execution and a stay of the proceedings in his re-
opened federal habeas corpus action to permit petitioner to
return to state court and exhaust state habeas remedies based
upon the filing of new proposed legislation in the United States
Senate, i.e., the "Consular Notification Compliance Act" that is
the subject of petitioner's motions for stay herein.  In an order
issued June 21, 2011, the undersigned dismissed petitioner's
purported Rule 60(b) motion as an unauthorized second or
successive petition and denied petitioner's requests for stay.

J.   Section 1983 Lawsuit

On December 1, 2009, petitioner herein filed a federal civil
rights lawsuit pursuant to Title 42 U.S.C. §1983 seeking an order
from this Court directing certain Bexar County, Texas officials
to turn over to petitioner for expert examination and additional
DNA testing petitioner's underwear and cuttings made therefrom
which had been admitted into evidence during petitioner's
original state criminal trial in 1995.  That action was docketed
as cause no. SA-09-CA-950-OG.  This Court stayed that proceeding
pending the Supreme Court's ruling in *Skinner v. Switzer*, ___
U.S. ___, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011).  Following the
Supreme Court's rendition of its opinion in *Skinner*, petitioner
filed an amended complaint and a motion for temporary restraining
order.  In a detailed Memorandum Opinion and Order issued June
20, 2011, this Court denied plaintiff's request for a TRO and

36

dismissed plaintiff's amended complaint without prejudice as frivolous, pursuant to Title 28 U.S.C. §1915(e)(2)(B)(i).

## II. Preliminary Review Mandated in Federal Habeas Actions

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts provides, in pertinent part, as follows: "If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner." Rule 5(a) of the same Rules provides as follows: "The respondent is not required to answer the petition unless a judge so orders." Given the proximity of petitioner's rapidly approaching July 7, 2011 execution date, it is particularly important this Court undertake a preliminary review of petitioner's pleadings herein, even before service of same on respondent.

## III. Analyzing Petitioner's Previous Habeas Corpus Actions

### A. First Federal Habeas Action

In his first federal habeas corpus action, i.e., cause no. SA-99-CA-1301-RF, petitioner herein presented a host of claims attacking his state criminal conviction and death sentence. Petitioner obtained rulings on the merits of all of those claims from this Court. *Leal v. Dretke*, 2004 WL 2603736, *34. The Fifth Circuit later agreed with Judge Furgeson that none of

petitioner's claims therein warranted a CoA. *Leal v. Dretke*, 428 F.3d at 553.

B.   Second Federal Habeas Action

In his second federal habeas corpus action, i.e., cause no. SA-07-CA-214-RF, petitioner argued he was entitled to have the validity of his 1995 capital murder conviction re-examined pursuant to the ICJ's *Avena* decision.   More specifically, petitioner argued he was entitled to have a court of competent jurisdiction undertake a "review and reconsideration" of his capital murder conviction for the purpose of determining whether he sustained "actual prejudice" in connection with his capital murder trial as a result the violation of his Vienna Convention right to consular notification.   In dismissing petitioner's second federal habeas corpus action, Judge Furgeson issued both a procedural ruling and, in the alternative, a substantive ruling in petitioner's second federal habeas corpus action, i.e., SA-07-CA-214-RF.

1.   The Procedural Ruling

Judge Furgeson concluded, in part, petitioner's federal habeas corpus petition therein constituted a second or successive petition for which petitioner was required to first seek permission from the Fifth Circuit because petitioner could have presented his Vienna Convention claim during the course of petitioner's first federal habeas corpus action. *Leal v. Dretke*,

38

2007 WL 4521519, at *4-*7.  In conjunction with his analysis of the procedural posture of petitioner's *Avena*/Vienna Conviction claim, Judge Furgeson also determined as follows:

> As of March 31, 2004, petitioner possessed a legal right under the plain language of the ICJ's decision in *Avena* to have a court of competent jurisdiction in this nation determine, pursuant to the ICJ's opinion in *Avena*, whether petitioner's sustained "actual prejudice" in connection with either his conviction or sentence as a result of the violation of petitioner's rights under Article 36 of the Vienna Convention. Nothing in the President's memorandum of February 28, 2005 either added to or diminished petitioner's rights under the ICJ's judgment in *Avena*.[90]

*Leal v. Dretke*, 207 WL 4521519, *7.

On appeal, the Fifth Circuit concluded otherwise, determining petitioner's *Avena*/Vienna Convention claim was premised upon more than the ICJ's decision in *Avena* - it was based in significant part on a Presidential memorandum issued February 28, 2005, subsequent to Judge Furgeson's disposition of

---

[90] Necessarily implicit in this aspect of Judge Furgeson's holding were conclusions that (1) Article 36 of the Vienna Convention created individually enforceable rights available to petitioner and other foreign citizens arrested within the United States and (2) Title 28 U.S.C. Section 2254 afforded a means to vindicate those rights.  At the time of Judge Furgeson's opinion, the Fifth Circuit had twice held the Vienna Convention created no individually enforceable right to consular notification. *See Medellin v. Dretke*, 371 F.3d 270, 279-80 (5th Cir. 2004)(holding the Vienna Convention does not create any individually enforceable rights), *cert. dism'd*, 544 U.S. 660 (2005); *United States v. Jimenez-Nava*, 243 F.3d 192, 195-98 (5th Cir.)(holding Article 36 of the Vienna Convention does not create any individually enforceable rights), *cert. denied*, 533 U.S. 962 (2001).

petitioner's first federal habeas corpus petition. *See Leal Garcia v. Quarterman*, 573 F.3d at 223-24: "As the Bush declaration was not issued until after Leal's first petition was denied, the basis of his claim - Texas' refusal to conduct the review of his conviction - did not occur until well after proceedings on his first petition had concluded."

Judge Furgeson concluded, as did the Supreme Court in *Medellin v. Texas*, 552 U.S. 491, 525-32, 128 S.Ct. 1346, 1368-72, 170 L.Ed.2d 190 (2008), that the Presidential memorandum issued February 28, 2005 relied upon therein by petitioner neither added to nor diminished petitioner's rights under the ICJ's *Avena* decision. *Leal v. Dretke*, 2007 WL 4521519, *7.

On appeal, the Fifth Circuit reached the same result, albeit for slightly different reasons. *See Leal Garcia v. Quarterman*, 573 F.3d at 224: "The Supreme Court's decision in *Medellin v. Texas*, has deprived the *Avena* decision and the Bush declaration of whatever legal force Leal might claim they ever had."

Ultimately, the Fifth Circuit reversed Judge Furgeson's procedural ruling, concluding petitioner's federal habeas corpus petition herein was not a "second or successive" petition within the meaning of Section 2244. *Leal Garcia v. Quarterman*, 573 F.3d at 224.

40

2.   <u>The Substantive Ruling</u>

In his alternative substantive ruling, Judge Furgeson
carefully reviewed the ICJ's *Avena* decision, analyzed the
evidence presented during petitioner's trial and state habeas
corpus proceeding (which Judge Furgeson and his staff had spent
years reviewing and analyzing in connection with petitioner's
first federal habeas corpus proceeding in this Court), and
concluded petitioner had not sustained "actual prejudice" within
the meaning of the ICJ's *Avena* decision by virtue of the
undisputed violation of petitioner's Vienna Convention right to
timely consular notification of petitioner's arrest and timely
notice to petitioner of his right to seek assistance from Mexican
consulate officials. *Leal v. Dretke*, 2007 WL 4521519, *7-*22.

More specifically, Judge Furgeson described the ICJ's *Avena*
decision as follows:

> The ICJ's *Avena* opinion included several
> unambiguous holdings.  Among these were the ICJ's
> conclusions that (1) the violations of Article 36 of
> the Vienna Convention which it determined had occurred
> in the cases of some but not all of the Mexican
> nationals who were parties to the *Avena* lawsuit
> entitled petitioner and those similarly situated to
> have their convictions and sentences reviewed and
> reconsidered by courts of competent jurisdiction to
> determine whether they were actually prejudiced as a
> result of the violations of Article 36 found by the
> ICJ, *Avena*, 2004 I.C.J. 12, ¶¶119-23, 148, 152, 2004 WL
> 2450913, *59-*60, *68, *70; (2) the ICJ expressly
> disavowed that it was either suggesting or implying any
> ruling on the issue of whether the notification rights
> established by Article 36 constituted "fundamental

41

human rights," *Avena*, 2004 I.C.J. 12, ¶¶124-25, 2004 WL
2450913, *60-*61; (3) the ICJ was *not* declaring that
any automatic exclusionary rule must be employed by
courts of the United States in the cases of those
Mexican nationals whose Article 36 rights had been
violated, *Id.*, 2004 I.C.J. 12, ¶¶125-26, 2004 WL
2450913, *61; (4) the "review and reconsideration"
necessary in the cases of those Mexican nationals whose
Article 36 rights were violated must focus on the legal
consequences of the violations "upon the criminal
proceedings that have followed the violation," *Avena*,
2004 I.C.J. 12, ¶¶127, 131, 138-41, 148, 152, 2004 WL
2450913, *61-*62, *65-*66, *68, *70; (4) the mandatory
"review and reconsideration" must be effective, i.e.,
such review may not be foreclosed by local procedural
default principles premised on a defendant's failure to
timely raise the asserted violation of his Article 36
rights because "what is crucial in the review and
reconsideration process is the existence of a procedure
which guarantees that full weight is given to the
violation of the rights set forth in the Vienna
Convention, whatever may be the actual outcome of such
review and reconsideration," *Avena*, 2004 I.C.J. 12,
¶¶138-41, 2004 WL 2450913, *65-*66; (5) clemency
procedures are inadequate to satisfy the duty of review
and reconsideration imposed on the United States by the
ICJ's judgment, *Avena*, 2004 I.C.J. 12, ¶¶142-43, 2004
WL 2450913, *66; and (6) "The rights guaranteed under
the Vienna Convention are treaty rights which the
United States has undertaken to comply with in relation
to the individual concerned, irrespective of the due
process rights under United States constitutional law."
*Avena*, 2004 I.C.J. 12, ¶139, 2004 WL 2450913, *65.

The ICJ made crystal clear its conclusion that
"the process of review and reconsideration should occur
within the overall judicial proceeding relating to the
individual defendant concerned." *Avena*, 2004 I.C.J. 12,
¶141, 2004 WL 2450913, *66.

*Leal v. Quarterman*, 2007 WL 4521519, *7-*8.

Judge Furgeson granted a CoA on both his procedural and

substantive rulings. *Id.*, *22-*25.

The Fifth Circuit vacated that portion of Judge Furgeson's findings of fact and conclusions of law addressing the merits of petitioner's *Avena*/Vienna Convention claim, citing a prior Fifth Circuit opinion which rejected the argument that the ICJ's *Avena* decision created any individually enforceable rights recognizable in state or federal court. *Leal Garcia v. Quarterman*, 573 F.3d at 218 n.19 (5th Cir. 2009) (*citing Medellin v. Dretke*, 371 F.3d 270, 280 (5th Cir.), *cert. denied*, 543 U.S. 1032 (2004)).

Finally, the Fifth Circuit modified this Court's dismissal of this cause without prejudice, citing the Supreme Court's holding in *Medellin v. Texas, supra*. See *Leal Garcia v. Quarterman*, 573 F.3d at 224-25 (*citing Medellin v. Texas*, 552 U.S. 491, 511, 128 S.Ct. 1346, 1360, 170 L.Ed.2d 190 (2008)("The ICJ Statute, incorporated into the U.N. Charter, provides further evidence that the ICJ's judgment in *Avena* does not automatically constitute federal law judicially enforceable in United States courts.")).

Instead, the Fifth Circuit dismissed petitioner's *Avena*/Vienna Convention claim therein *with* prejudice. *Leal Garcia v. Quarterman*, 573 F.3d at 224-25. In so doing, the Fifth Circuit effectively vacated this Court's dismissal of this cause without prejudice and issued its own judgment rendering a final decision *on the merits* of petitioner's *Avena*/Vienna Convention claim, denying same. See *Haywood v. Drown*, ___ U.S. ___, ____,

43

129 S.Ct. 2109, 2130, 173 L.Ed.2d 2108 (2009)(dismissal of a
Section 1983 "with prejudice" was a decision "on the merits");
*Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 86,
121 S.Ct. 513, 520-21, 148 L.Ed.2d 373 (2000)(district court
order dismissing claims "with prejudice" disposed of entire case
"on the merits"); *Blanchard 1986, Ltd. v. Park Plantation, LLC*,
553 F.3d 405, 409 n.15 (5th Cir. 2008)(dismissals for lack of
jurisdiction are not considered adjudications on the merits but
dismissals with prejudice for failure to state a claim are
decisions on the merits).

3.   <u>The Big Picture</u>

In his second federal habeas corpus action (which the Fifth
Circuit specifically held was *not* successive within the meaning
of Section 2244(b)(3)), i.e., cause no. SA-07-CA-214-RF,
petitioner argued he was entitled as a matter of federal law and
constitutional right to have an appropriate state or federal
court undertake the "review and reconsideration" petitioner felt
was mandated by virtue of the ICJ's *Avena* decision, i.e., an
analysis of whether the violation of petitioner's right to
consular notification and notice of consular rights under Article
36 of the Vienna Convention (which the ICJ found had actually
occurred in petitioner's case) caused petitioner "actual
prejudice" in connection with petitioner's capital murder trial.
In his alternative holding, Judge Furgeson made findings of fact

and conclusions of law in an attempt to furnish petitioner with
precisely the type of "review and reconsideration" Judge Furgeson
believed was mandated under the ICJ's *Avena* decision. *Leal v.
Dretke*, 2007 WL 4521519, *8-*22.   The Fifth Circuit not only
reversed Judge Furgeson's procedural ruling (on the successive
nature of petitioner's second federal habeas petition) but also
vacated all of Judge Furgeson's findings and conclusions
regarding the merits of petitioner's *Avena* claim and held
petitioner was not entitled to the "review and reconsideration"
petitioner seeks herein because the Supreme Court's holding in
*Medellin v. Texas*, 552 U.S. at 506 & n.4, 128 S.Ct. at 1357 &
n.4, foreclosed same.

Thus, insofar as petitioner's pleadings herein attack Judge
Furgeson's factual findings and legal conclusions regarding
whether petitioner sustained "actual prejudice" within the
meaning of *Avena*,[91] petitioner is flogging an expired equine.
Judge Furgeson's findings and conclusions on that subject were
vacated by the Fifth Circuit. *Leal Garcia v. Quarterman*, 573 F.3d
at 224-25.

The Fifth Circuit also issued its own judgment dismissing
petitioner's *Avena* claims in his second federal habeas corpus
proceeding *with prejudice*. *Leal Garcia v. Quarterman*, 573 F.3d at

---

[91] Amended Petition, at p. 28 n.6.

45

224-25.  Therefore, insofar as petitioner's pleadings herein purport to attack Judge Furgeson's determination that petitioner's second federal habeas corpus action constituted a "second or successive" habeas petition within the meaning of Section 2244(b)(3), those complaints are likewise *non sequitur*. There is no longer any judgment in existence dismissing his *Avena*/Vienna Convention claims on that basis. *See Leal Garcia v. Quarterman*, 573 F.3d at 224 (holding petitioner's *Avena*/Vienna Convention claim was non-successive and reversing Judge Furgeson's holding to the contrary).

### IV. Preliminary Review of Petitioner's Amended Petition

Petitioner filed this action pursuant to Title 28 U.S.C. Section 2254 seeking federal habeas relief from his July, 1995 Bexar County capital murder conviction and sentence of death.

In his Amended Petition herein, petitioner argues he is entitled to review of his 1995 capital murder conviction pursuant to the provisions of the ICJ's *Avena* decision by virtue of the recent filing in the United States Senate of proposed legislation, i.e., the Consular Notification Compliance Act.[92]

---

[92] Amended Petition, at p. 1.
Petitioner's Amended Petition presents a number of new arguments which have never previously been presented to any state or federal court, to wit, arguments that (1) petitioner is mentally retarded and, therefore, exempt from execution under the Supreme Court's holding in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), (2) new scientific advances have rendered the "bite mark evidence" presented during

Petitioner erroneously states at one point in his Amended Petition that his claim herein is based upon "federal legislation passed on June 14, 2011."[93]  The remainder of petitioner's Amended Petition and the voluminous exhibits attached thereto reveal, however, the piece of proposed federal legislation relied upon by petitioner as the legal basis for his claim herein has not yet been passed by either house of the Congress: "The claim

---

petitioner's trial inherently unreliable and inadmissible under the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), (3) the prosecution's evidence showing the presence of "blood" inside and on the exterior of petitioner's vehicle was based on now-discredited theories about Luminol reliability which are no longer valid, rendering such testimony inadmissible under the *Daubert* standard, (4) petitioner's trial counsel rendered ineffective assistance by (a) failing to adequately investigate petitioner's background, (b) failing to develop and present potentially mitigating evidence showing (i) petitioner was physically abused as a child by both his parents, (ii) as a child, petitioner was molested and raped by a pedophile priest, and (iii) petitioner suffered multiple head injuries as a child which caused organic brain damage which restrict petitioner's abilities to function intellectually, socially, and emotionally, and (c) failing to call petitioner's parents to testify regarding the circumstances surrounding the discovery of Adria Sauceda's blood blouse inside their home, and (5) additional DNA testing might exclude some portion of the prosecution's evidence introduced during petitioner's trial.  This Court has reviewed such arguments solely in the context of petitioner's *Avena*/Vienna Convention claim herein.  To do otherwise, i.e., to treat those arguments as free-standing claims for federal habeas corpus relief, would likely render petitioner's federal habeas corpus petition herein a "successive" petition within the meaning of Section 2244(b)(3).

[93] Amended Petition, at p. 20.

raised here arises as a result of legislation that was introduced two days prior to the filing of the petition."[94]

On June 24, 2009, the Fifth Circuit held petitioner was not entitled to the type of "review and reconsideration" of petitioner's capital murder conviction that petitioner claimed was mandated by the ICJ's decision in *Avena*. *Leal Garcia v. Quarterman*, 573 F.3d at 224-25.

The initial problem with the latest incarnation of petitioner's *Avena*/Vienna Convention claim is the fact the Supreme Court's ruling in *Medellin v. Texas*, 552 U.S. at 508-14, 128 S.Ct. at 1358-61 (interpreting the Vienna Convention and other international agreements underlying the ICJ's *Avena* decision as not providing for implementation of ICJ judgments through direct enforcement in United States domestic courts), and the Texas Court of Criminal Appeals' ruling in *Ex parte Medellin*, 223 S.W.3d 315, 330-32 (Tex. Crim. App. 2006)(holding ICJ decisions are not binding on United States courts), *affirmed*, 552 U.S. 491 (2008), both remain good law in this jurisdiction.  As a result, despite the pending *proposed* legislation, there is *currently* no state or federal judicial forum available in which petitioner may obtain a ruling on the merits of his new *Avena*/Vienna Convention claim, even if that claim is based on an

---

[94] Amended Petition, at p. 1.

entirely different set of factual allegations than those
petitioner asserted in support of his second federal habeas
corpus action in cause no. SA-07-CA-214-RF.

The Fifth Circuit's dismissal *with prejudice* of petitioner's
petition in petitioner's second federal habeas corpus proceeding,
i.e., cause no. SA-07-CA-214-RF, determined petitioner's rights
under the *Avena* decision and the Vienna Convention "on the
merits."  The Fifth Circuit's judgment in that cause denied
petitioner relief to petitioner "on the merits" of his
*Avena*/Vienna Convention claim. *Leal Garcia v. Quarterman*, 573
F.3d at 224-25.  In so ruling, the Fifth Circuit reaffirmed the
continued vitality of a long line of Fifth Circuit opinions
holding (1) Article 36 of the Vienna Convention does not create
any individually enforceable rights, (2) violations of the Vienna
Conventions's consular notification provisions do not warrant
application of the exclusionary rule, and (3) procedural default
principles apply to assertions of Vienna Convention rights. *See,
e.g.*, *Gomez v. Quarterman*, 529 F.3d 322, 327-30 (5th
Cir.)(denying CoA on a Vienna Convention claim requesting
suppression of evidence after discussing at length the Supreme
Court's Vienna Convention jurisprudence), *cert. denied*, ___ U.S.
___, 129 S.Ct. 628, 172 L.Ed.2d 618 (2008); *Medellin v. Dretke*,
371 F.3d 270, 279-80 (5th Cir. 2004)(applying procedural default
principles to prevent merits review of a Vienna Convention claim

and, alternatively, concluding the Vienna Convention does not create any individually enforceable rights), *cert. dism'd*, 544 U.S. 660 (2005); *United States v. Jimenez-Nava*, 243 F.3d 192, 195-98 (5th Cir.)(holding Article 36 of the Vienna Convention does not create any individually enforceable rights), *cert. denied*, 533 U.S. 962 (2001); *Flores v. Johnson*, 210 F.3d 456, 458 (5th Cir.)(holding *Teague v. Lane* foreclosed adoption of a rule excluding evidence secured by police in violation of a defendant's right to consular notification under Article 36), *cert. denied*, 531 U.S. 987 (2000); *Faulder v. Johnson*, 81 F.3d 515, 520 (5th Cir.)(holding violation of a criminal defendant's consular notification rights under the Vienna Convention was harmless error), *cert. denied*, 519 U.S. 995 (1996).  All of these legal authorities remain valid and compel the conclusion there is no arguable legal basis *at this time* for petitioner's efforts herein to seek "review and reconsideration" of his 1995 capital murder conviction pursuant to the terms of the ICJ's *Avena* decision or Article 36 of the Vienna Convention.

Simply put, as of this date, petitioner's latest *Avena*/Vienna Convention claim is foreclosed by (1) the continuing vitality of the Supreme Court's holding in *Medellin v. Texas, supra,* (2) the continuing vitality of the Fifth Circuit's opinions in *Medellin v. Dretke, supra*, and *United States v. Jimenez-Nava, supra*, declaring the Vienna Convention does not

50

create any individually enforceable rights, and (3) the Fifth
Circuit's opinion in *Leal Garcia v. Quarterman, supra*, dismissing
*with prejudice* a previous incarnation of petitioner's
*Avena*/Vienna Convention claim herein.  Under any one of those
authorities, petitioner has no arguable legal basis upon which to
seek merits review of his *Avena*/Vienna Convention claim from
this, or any other, federal court.  Collectively, they render
petitioner's claims herein utterly lacking in arguable merit.
Moreover, in view of the continued vitality of the Texas Court of
Criminal Appeals' holding in *Ex parte Medellin, supra*, there is
no arguable legal basis upon which petitioner can seek merits
review of his latest *Avena*/Vienna Convention claim from any Texas
court.

The filing of *proposed* federal legislation designed to
create a new right to which petitioner is not entitled under
current law does not change the legal landscape in which this
Court must evaluate the merits of petitioner's claims herein. *See*
*Young v. Fordice*, 520 U.S. 273, 282-83, 117 S.Ct. 1228, 1235, 137
L.Ed.2d 448 (1997)(Mississippi's provisional plan for voter
registration was never "in force and effect" and did not become
part of the baseline against which Mississippi's voter
registration laws had to be judged under the Voting Right Act
where the Mississippi state legislature never actually passed the
plan and administrative implementation of the plan occurred only

briefly (about forty days) and sporadically (about a third of the state's voter registrars implemented same) statewide).

Moreover, as explained by petitioner in his pleadings herein, there have been two previous, unsuccessful, attempts by members of Congress to pass legislation which would grant petitioner the type of "review and reconsideration" to which he claims he is entitled under the ICJ's *Avena* decision.   The failure of previous legislative efforts to afford petitioner the relief he seeks herein could be construed as a "consensus" reflecting a negative legislative view of the proposal. *See Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 953 n.15 (5th Cir. 2011)(holding the failure of Congress to pass proposed federal legislation creating private causes of action by consumers against foreign nations and international oil cartels, such as OPEC, for price-fixing reflected "an apparent political consensus" that such private litigation was to be avoided), *cert. filed May 5, 2011 (no. 10-1371)*.

Moreover, a proposed bill is just that - a mere proposal. It is not an enactment of new law.   Until such time as the bill is passed by the Congress and either the passed bill is signed by the President or the Congress overrides a Presidential veto of same, there is no new law. *See Medellin v. Texas*, 552 U.S. at 526, 128 S.Ct. at 1369 ("the terms of a non-self-executing treaty can become domestic law only in the same way as any other law-

through passage of legislation by both Houses of Congress, combined with either the President's signature or a congressional override of a Presidential veto."). As a result, the filing of a legislative proposal in the form of a bill is of no legal consequence.  The Consular Notification Compliance Act has yet to make this journey through the legislative process and, as such, its mere filing in the United States Senate furnishes petitioner no arguable legal basis for federal habeas corpus relief herein under Section 2254.

Under such circumstances, petitioner's latest *Avena*/Vienna Convention claim is plainly without arguable merit and, therefore, subject to summary dismissal by this Court pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts.  Petitioner's Amended Petition will be dismissed without prejudice in conformity with Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts.

### V. Petition's Motion for Stay of Execution

"A stay of execution pending disposition of a second or successive federal habeas petition should be granted only when there are 'substantial grounds upon which relief might be granted.'" *Delo v. Stokes*, 495 U.S. 320, 321, 110 S.Ct. 1880, 1881, 109 L.Ed.2d 325 (1990).  It is an abuse of discretion to grant a stay, even when there was good cause for a failure to

raise a claim previously, when an unexhausted claim is plainly meritless. *Rhines v. Weber*, 544 U.S. 269, 277, 125 S.Ct. 1528, 1535, 161 L.Ed.2d 440 (2005); *Neville v. Dretke*, 423 F.3d 474, 479 (5th Cir. 2005). Petitioner's latest permutation of his *Avena*/Vienna Convention claim is plainly meritless.

As explained above, the Supreme Court's holding in *Medellin v. Texas*, 552 U.S. at 508-14, 128 S.Ct. at 1358-61 (interpreting the Vienna Convention and other international agreements underlying the ICJ's *Avena* decision as not providing for implementation of ICJ judgments through direct enforcement in United States domestic courts), is still the law of the land and forecloses *federal* habeas review of petitioner's *Avena*/Vienna Convention claim. Likewise, the Texas Court of Criminal Appeals' opinion in *Ex parte Medellin*, 223 S.W.3d at 330-32 (holding ICJ decisions are not binding on United States courts), remains the governing law in Texas. Absent the *passage of actual legislation* by the Congress or the Texas Legislature, or a ruling by the Supreme Court recognizing the existence of individually enforceable rights created by Article 36 of the Vienna Convention, petitioner remains without a forum in which to re-litigate his newly re-cast *Avena*/Vienna Convention claims.[95]

-----

[95] The facts offered by petitioner in support of his latest *Avena*/Vienna Convention claim differ considerably from the sparse facts petitioner presented to Judge Furgeson in support of his 2007 federal habeas corpus petition in cause no. SA-07-CA-214-RF.

Petitioner's new *Avena*/Vienna Convention claim is plainly
meritless because the Fifth Circuit's opinion dismissing
petitioner's 2007 version of the same claim was "with prejudice"
and the condition precedent to petitioner obtaining review of his
*Avena*/Vienna Convention claim, i.e., the passage of new law
expressly permitting the type of review and reconsideration
petitioner seeks,[96] has not yet come to pass.

The filing of proposed legislation which might one day
afford petitioner a remedy in the state or federal courts does
not, standing alone, justify a stay of execution under such
circumstances. *See Medellin v. Texas*, 554 U.S. 759, 760, 129
S.Ct. 360, 361, 171 L.Ed.2d 833 (2008)(citing the failure of the
President or State of Texas to represent the existence of a
likelihood of congressional or state legislative action and the
inability of Congress to move beyond bare introduction of a bill
implementing the United States' Vienna Convention treaty
obligations recognized in *Avena* in the months since the Supreme

---

[96] In a footnote, the Fifth Circuit suggested, in *obiter
dictum*, that the if Congress actually passed a law granting
petitioner a right to the type of "review and reconsideration" he
seeks herein, petitioner could file a new federal habeas corpus
action requesting same. *Leal Garcia v. Quarterman*, 573 F.3d at
224 n.54. Because the condition precedent to the filing of such
a new federal habeas action has not yet transpired, and quite
possibly might never transpire, petitioner's latest *Avena*/Vienna
Convention claim is foreclosed for the exact same reasons his
last such claim was dismissed with prejudice.

Court's March, 2008 decision in *Medellin v. Texas*, *supra*, as justifications for denying Medellin a stay of execution).

Petitioner's assertions herein concerning the likelihood of passage of the "Consular Notification Compliance Act" are supported by little more than highly speculative predictions from a variety of political science professors and a handful of hopeful executive branch and congressional officers.

The procedural problems confronting foreign citizens attempting to assert their right to consular notification under Article 36 of the Vienna Convention are not of recent vintage. In this Circuit alone, both before and after the ICJ's *Avena* decision, foreign citizens have faced a daunting array of procedural hurdles and substantive rulings preventing them from obtaining relief following violations of their consular notification rights under Article 36 of the Vienna Convention. *See, e.g.*, *Gomez v. Quarterman*, 529 F.3d at 327-30 (denying CoA on a Vienna Convention claim requesting suppression of evidence after discussing at length the Supreme Court's Vienna Convention jurisprudence); *Medellin v. Dretke*, 371 F.3d at 279-80 (applying procedural default principles to prevent merits review of a Vienna Convention claim and, alternatively, concluding the Vienna Convention does not create any individually enforceable rights); *United States v. Jimenez-Nava*, 243 F.3d at 195-98 (holding Article 36 of the Vienna Convention does not create any

individually enforceable rights); *Flores v. Johnson*, 210 F.3d at 458 (the Supreme Court's holding in *Teague v. Lane* foreclosed adoption of a rule excluding evidence secured by police in violation of a defendant's right to consular notification under Article 36); *Faulder v. Johnson*, 81 F.3d at 520 (violation of a criminal defendant's consular notification rights under the Vienna Convention was harmless error).  Thus, Congress has been on notice for more than a decade that foreign citizens who have attempted to assert their rights under Article 36 of the Vienna Convention in this Circuit have confronted barriers to assertion of their consular notification rights as well substantive rulings denying the existence of those very same rights.

Several years before the ICJ issued its *Avena* decision, the Supreme Court concluded "absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State." *Breard v. Greene*, 523 U.S. 371, 375, 118 S.Ct. 1352, 1354, 140 L.Ed.2d 529 (1998). In *Breard*, the Supreme Court held a criminal defendant had procedurally defaulted on his Vienna Convention claim by failing to assert same in an appropriate manner in the state courts. *Breard v. Greene*, 523 U.S. at 375-76, 118 S.Ct. at 1355.

Subsequent to the ICJ's decision in *Avena*, the Supreme Court concluded in *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 343-50, 126 S.Ct. 2669, 2678-82, 165 L.Ed.2d 557 (2006), that, even assuming

the existence of individually enforceable rights to consular notification arising from Article 36, the exclusionary rule does not apply to violations of the Vienna Convention.  Moreover, the Supreme Court also held state procedural default principles could be applied to Article 36 claims: "We therefore conclude, as we did in *Breard,* that claims under Article 36 of the Vienna Convention may be subjected to the same procedural default rules that apply generally to other federal-law claims." *Sanchez-Llamas v. Oregon*, 548 U.S. at 360, 126 S.Ct. at 2687.

Thus, Congress has been on notice since long before the issuance of the ICJ's *Avena* decision of the procedural impediments, as well as adverse substantive rulings, confronting foreign nationals who attempted to assert their rights under Article 36 of the Vienna Convention in the courts of this nation.

More than a decade has passed since the Supreme Court applied procedural default principles to a Vienna Convention claim in *Breard*.  More than seven years have passed since the ICJ handed down its *Avena* decision.  Almost five years have passed since the Supreme Court handed down its decision in *Sanchez-Llamas,* reaffirming its belief that state procedural default principles may permissibly trump any individual rights foreign citizens might posses under Article 36.  More than three years have passed since the Supreme Court issued its opinion in *Medellin v. Texas, supra.*  Almost two years have passed since the

Fifth Circuit specifically rejected "on the merits" petitioner's last *Avena*/Vienna Convention claim.  Since the Supreme Court issued its opinion in *Medellin v. Texas, supra*, apparently two attempts to get legislation through Congress to satisfy the Supreme Court's holding in that cause have proven unsuccessful. A third attempt is now underway but at this time has advanced only as far as the filing of more, proposed, legislation.  Thus, no genuine progress appears to have been made toward the actual passage of new, ameliorative, legislation since the Supreme Court denied Jose Ernesto Medellin's request for a stay of his execution in March, 2008.

Under such circumstances, petitioner has failed to establish that "substantial grounds" exist upon which relief may be granted to him pursuant to Title 28 U.S.C. Section 2254.  Petitioner is not entitled to a stay of execution in conjunction with his latest Section 2254 federal habeas corpus petition.

## VI. *In Forma Pauperis* Request

The documentation accompanying petitioner's motion for leave to proceed *in forma pauperis* indicates petitioner currently has more than five dollars in his inmate trust account with which to pay the five dollar filing fee in this cause.  Petitioner does not request court-appointed counsel.  Under such circumstances, petitioner's request that this Court waive the modest filing fee will be denied.  Petitioner will be directed to pay the filing

fee or face dismissal of this cause for reasons separate and apart from those set forth at length above.

## VII. <u>Certificate of Appealability</u>

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. §2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is

granted. *See Larry v. Dretke*, 361 F.3d 890, 896 (5th Cir.)
(recognizing CoA's are granted on an issue-by-issue basis), *cert.
denied*, 543 U.S. 893 (2004); *Crutcher v. Cockrell*, 301 F.3d 656,
658 n.10 (5th Cir. 2002)(holding a CoA is granted on an issue-by-
issue basis, thereby limiting appellate review to those issues);
*Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000)(holding the
same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir.
1997)(holding the scope of appellate review of denial of a habeas
petition limited to the issues on which CoA has been granted).
In other words, a CoA is granted or denied on an issue-by-issue
basis, thereby limiting appellate review to those issues on which
CoA is granted alone. *Larry v. Dretke*, 361 F.3d at 896; *Crutcher
v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at
151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d
at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28
U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a
substantial showing of the denial of a constitutional right.
*Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159
L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123
S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct.
1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S.
880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4. This Court is required to issue or deny a CoA when it enters a final Order, such as this one, adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*,

537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Foster v. Quarterman*, 466 F.3d at 364; *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir. 2006); *Pippin v. Dretke*, 434 F.3d at 787; *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

Petitioner's *Avena*/Vienna Convention claim herein does not satisfy the standard for obtaining a CoA.  The Supreme Court's opinion in *Medellin v. Texas, supra,* makes clear petitioner currently possesses no *Avena*/Vienna Convention claim cognizable in the federal courts.  The Fifth Circuit's opinions in *Medellin v. Dretke, Jimenez-Nava v. United States,* and *Leal Garcia v. Quarterman*, also foreclose petitioner from obtaining the relief he seeks from this Court.  The Texas Court of Criminal Appeals' opinion in *Ex parte Medellin* precludes petitioner from obtaining merits review of his *Avena*/Vienna Convention claim from the state courts at this time.  The continued vitality of all those judicial holdings is beyond question.  Only legislative action, in the form of enactment of actual legislation, will suffice to change the legal landscape sufficiently to afford petitioner a federal habeas forum for the "review and reconsideration" of his 1995 capital murder conviction and sentence of death which he seeks herein.  Reasonable minds could not disagree about any of

the foregoing conclusions.  Petitioner is not entitled to CoA on his claim herein.[97]

Accordingly, it is hereby **ORDERED** that:

1.  Petitioner's Amended Petition, filed June 17, 2011, docket entry no. 8, is **DISMISSED WITHOUT PREJUDICE** as plainly without merit pursuant to Rule 4, Rules Governing Section 2254 Cases in the United States District Courts.

2.  All relief requested in petitioner's motion for stay of execution, filed June 16, 2011, docket entry no. 4, as supplemented by petitioner's letter brief filed June 16, 2011, docket entry no. 7, is **DENIED.**

---

[97] In his original petition herein, filed June 16, 2011, docket entry no. 1 (henceforth "Original Petition"), petitioner argued his constitutional rights were violated when the state trial court admitted evidence of unadjudicated criminal conduct, i.e., testimony showing petitioner had sexually assaulted and bitten another teenage girl prior to his encounter with Sauceda. *See* Original Petition, at p. 51 n.16: "The Inter-American Commission on Human Rights found that use of this unadjudicated offense during the punishment phase of Mr. Leal's trial violated his rights to fair trial and due process under the American Declaration."  Petitioner implied obliquely in his Original Petition herein he was seeking relief from this Court that included not only vacation of his 1995 conviction and sentence for capital murder but also an order from this Court mandating that, on retrial, any evidence of unadjudicated criminal conduct on his part be excluded during the punishment phase of such trial. *Id.*, at pp. 61-63.  Petitioner's Amended Petition does not contain as clear an explication of this argument or implied request for such relief.  Accordingly, this Court did not include this argument in the list of potentially independent claims contained in note 92, *supra.*

3.  Petitioner's motion for leave to proceed *in forma pauperis*, filed June 16, 2011, docket entry no. 6, is **DENIED**.  On or before ten days from the date of this Order, petitioner shall pay the filing fee of five dollars to the Clerk of this Court or this cause will be dismissed pursuant to Title 28 U.S.C. Section 1915(e)(2)(A).

4.  The motion of petitioner's co-counsel, attorney Sandra L. Babcock, to appear herein *pro hac vice*, filed June 16, 2011, docket entry no. 2, is **GRANTED**.

5.  Petitioner is **DENIED** a Certificate of Appealability on his claim herein.

6.  All other pending motions are **DISMISSED** as moot.

**SIGNED and ENTERED this** _22_ **day of June, 2011.**

ORLANDO L. GARCIA
**United States District Judge**